## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ANIMAL LEGAL DEFENSE FUND,<br>525 East Cotati Avenue<br>Cotati, California 94931,<br><br>*Plaintiff*,<br><br>v.<br><br>THOMAS J. VILSACK, in his official<br>capacity, SECRETARY,<br>United States Department of Agriculture<br>1400 Independence Avenue, S.W.<br>Washington, D.C. 20250,<br><br>UNITED STATES DEPARTMENT OF<br>AGRICULTURE,<br>1400 Independence Avenue, S.W.<br>Washington, D.C. 20250,<br><br>KEVIN SHEA, in his official capacity,<br>ADMINISTRATOR,<br>Animal and Plant Health Inspection Service<br>4700 River Road<br>Riverdale, MD 20737<br><br>ANIMAL AND PLANT HEALTH<br>INSPECTION SERVICE,<br>4700 River Road<br>Riverdale, MD 20737,<br><br>*Defendants*. | Civ. Action No. 22-cv-3146 |

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

## INTRODUCTION

1.      Plaintiff Animal Legal Defense Fund ("ALDF") challenges the United States

Department of Agriculture's ("USDA") denial of Plaintiff's petition for rulemaking to revise the

1

agency's confiscation regulations to ensure the humane disposition of animals when an Animal Welfare Act ("AWA")[1] licensee is operating in blatant violation of AWA standards or goes out of business, either voluntarily or because its AWA license has been revoked or otherwise discontinued.[2]

2.      There currently exists a fatal gap in the AWA regulations that allows USDA to abandon at-risk animals at facilities with AWA violations so severe that the agency pursues enforcement or revokes or suspends the facility's AWA license.

3.      Though USDA is charged with "insur[ing] that animals . . . are provided humane care and treatment," 7 U.S.C. § 2131(1), and the agency has been granted the broad authority to promulgate any regulations needed to do so, *id*. § 2151, its current regulations only allow for confiscation of suffering animals under very narrow circumstances.  USDA in fact refuses to relocate animals from facility conditions that are so abhorrent that the agency has sought revocation of the facility's license—a feat that itself is rare and to date has required years of chronic AWA violations before the agency takes such action.

4.      USDA is aware of many AWA-licensed facilities that chronically flout AWA regulations and standards, yet the agency refuses to act within its broad statutory authority to remove barriers to immediate animal relocation.  Such was the case at Cricket Hollow Zoo, a northeast Iowa roadside zoo where hundreds of animals were kept in conditions so inhumane that, after years of chronic AWA violations, USDA initiated an enforcement action to fine the facility and revoke its license.  Throughout the proceedings the agency refused to seek animal

---

[1]  7 U.S.C. §§ 2131, *et seq*.
[2]  Defendants USDA and its Secretary Thomas J. Vilsack, and the Animal and Plant Health Inspection Service ("APHIS") and its Administrator Kevin Shea are collectively referred to herein as "USDA" or "Defendants."

relocation as a remedy, essentially committing to leave the animals to suffer and die in illegal conditions without any continuing USDA oversight.  A USDA administrative law judge ultimately revoked Cricket Hollow's AWA license but did not provide for animal confiscation and relocation.

5.     To address the agency's ongoing failure to effectuate the purposes of the AWA and protect animals in need, on July 19, 2016, ALDF submitted to USDA a petition for rulemaking seeking to expand the agency's confiscation regulations.

6.     On March 31, 2021, USDA denied Plaintiff's petition for rulemaking.  The agency's denial is primarily premised on the erroneous assertion that it does not have statutory authority to expand its confiscation regulations.  Directly contrary to the agency's stunted use of enforcement and confiscation, USDA also reasoned that its existing regulations are adequate to address the problem, the requested amendments would not help the animals most in need, and the requested amendments would unduly expand the enforcement process.

7.     USDA's denial of Plaintiff's rulemaking petition is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" in violation of the Administrative Procedure Act ("APA").  5 U.S.C. § 706(2)(A).

8.     Congress granted USDA broad authority to promulgate the regulations necessary to effectuate the purposes of the AWA, including the authority to provide for confiscation pending license revocation and suspension.  USDA's existing narrow confiscation regime does not adequately protect animal welfare, as shown by numerous documented cases of animals being left by the agency in squalid and unsafe conditions, as well as the frequency of confiscation plummeting over the last decade.  Plaintiff's proposed amendments would protect animals that are in dire need—these at-risk animals have been forsaken by USDA, left in the

hands of chronic AWA violators.  The agency also ignored that Plaintiff's proposed amendment would only add confiscation as an option when the agency already is pursuing or has completed enforcement, which only happens in the face of persistent AWA violations directly impacting animal health and welfare.

9.      Thus, for the agency to meet its duty to ensure animals at AWA-regulated facilities are provided with humane care and treatment, the agency must reconsider Plaintiff's petition for rulemaking and expand its confiscation regulations to allow for relocation pending license revocation, suspension, and relinquishment.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question arising under the laws of the United States) and 28 U.S.C. § 1346 (actions against the United States).

11.      Venue in this Court is proper pursuant to 28 U.S.C. § 1391(e) because this action is brought against an agency of the United States and officers of the United States acting in their official capacities.

12.      This Court may award all necessary injunctive relief pursuant to the APA, 5 U.S.C. § 706(2), and may award declaratory relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02.

## PARTIES

### A.  Plaintiff

13.      Plaintiff Animal Legal Defense Fund is a national nonprofit membership organization founded in 1971 in Cotati, California.  ALDF's mission is to protect the lives and advance the interests of animals through the legal system.  Advocating for effective oversight

and regulation of the captive animal industry is one of ALDF's main goals, which it achieves by filing lawsuits, administrative comments, and rulemaking petitions to uphold and increase protections for animals; by supporting strong animal protection legislation at the state and national levels; and by educating law students, members, and supporters about laws that help captive animals.

14.     When ALDF learns about AWA violations, it advocates for remedies that will protect the animals at the violator facility, including, among other things, revocation of the violator's AWA license and relocation of the animals to a facility that can provide them with adequate care.  USDA's denial of ALDF's petition for rulemaking frustrates ALDF's mission and requires a diversion of ALDF's resources to counteract the agency's failure to protect animals.  Because USDA does not rehome animals during enforcement that may result license revocation or termination, or when a license is revoked, terminated, suspended, or relinquished— instead only confiscating animals in exceedingly rare circumstances—ALDF must expend additional resources conducting rescue activities itself, and engaging in both federal and state legal action to secure animal rescues.  Additionally, ALDF must expend additional resources on federal and state agency advocacy, legislative lobbying, and public education and campaigning levers in attempts to ensure the animals at issue ultimately receive humane care and treatment. ALDF's limited resources could instead be directed toward its other advocacy efforts, such as its criminal justice or farmed animal campaigns.

15.     For example, when USDA failed to confiscate and rehome animals in terrible conditions at Cricket Hollow Zoo in Iowa during and at the conclusion of AWA enforcement, ALDF had to expend its limited resources on a years-long public nuisance lawsuit against the zoo, at the conclusion of which ALDF undertook rescue and rehoming of animals.  Further,

ALDF continues to expend its resources on tracking down animals hidden away before ALDF was able to conduct its rescue.

16.     Another example relates to USDA's failure to rescue an orca named Lolita from captivity at the Miami Seaquarium.  Lolita has been suffering at the Seaquarium for half a century in a tiny tank with no shade, and for 40 of those years with no interaction with other orcas.  Accordingly, faced with USDA's unwillingness to help Lolita over the last decade, ALDF and others have filed numerous suits against USDA and the Seaquarium in attempts to rescue Lolita.  Most recently, Lolita was removed from the facility's AWA license following a scathing inspection report that found Lolita suffering on numerous accounts.  Regardless, USDA did not confiscate or otherwise arrange for the humane disposition of Lolita, who continues to languish at the Seaquarium.  Because of USDA's failure to save Lolita, ALDF is forced to continue to expend its limited resources to advocate for her to be removed to a sanctuary or at minimum, a facility that is in compliance with the AWA.

17.     In addition to its organizational interest in animal welfare, ALDF also has an interest in ensuring human health and welfare risks are prevented through enforcement of the AWA.  For instance, humans risk disease spread from AWA-regulated commercial breeders selling unhealthy pets and AWA-regulated exhibitors that confine exotic and wild animals in dirty, small, dimly lit, and other inhumane conditions and allow public interaction.  Dangerous wild animal escapes due to unkempt and improper animal enclosures and fences at AWA-regulated roadside zoos also risk human health harms.

18.     ALDF has more than 300,000 members and supporters nationwide, many of whom enjoy observing and interacting with animals at AWA-regulated facilities, such as zoos and amusement parks, across the country.  Their aesthetic, emotional, recreational, and

educational interests are harmed when they see exhibited animals treated inhumanely.  Many

ALDF members have developed strong emotional connections to animals they have visited.

Seeing animals kept in physically and psychologically harmful conditions has led these ALDF

members to suffer personal distress.  In these ways, ALDF members are harmed by USDA's

arbitrary and capricious denial of the petition, and the agency's failure to confiscate animals

from chronic AWA violators despite seeking enforcement and license revocation.

19.      Some of these individual ALDF members have seen animals in dirty, feces-laden

enclosures without access to water.  Others have seen animals injure themselves by pulling out

their hair and ramming their heads against enclosure walls.  Viewing animals in such conditions

has caused personal anguish, including sleepless nights and stress, to these ALDF members.

20.      ALDF members continue to experience this distress in two ways due to USDA's

denial of the petition and failure to confiscate animals in need:  some repeatedly visit the animals

to whom they have connected and continue to suffer by observing the animals in harmful

conditions, while others avoid returning to visit the animals because they cannot bear to view the

conditions again.  Such harms to ALDF members are prolonged by USDA's failure to confiscate

animals from these conditions.

21.      ALDF and its members have spent significant time attempting to improve the

welfare and conditions of animals the members have seen in distress.  They have written letters

to local authorities, state agencies, and USDA, called federal and state legislators, and started

petitions to help the animals at risk for suffering, whom USDA fails to protect under its current

confiscation regulations.

22.     For example, Tracey Kuehl ("Tracey") is a member of ALDF.  From her earliest memories of caring for cows and pigs on her family's Iowa farm, she has felt a strong sense of respect, stewardship, and love for animals.

23.     Tracey derives personal, recreational, educational, and aesthetic value from being in the presence of animals and observing animals in humane conditions.  She has visited nearly every zoo within 300 miles of the Quad Cities because of her personal, recreational, educational, and aesthetic interest in observing animals that she knows she will never have the opportunity to see in the wild, and because she believes zoos are enjoyable places to go with her friends. Tracey suffers personal distress when she witnesses animals in conditions that physically or psychologically harm the animals or are otherwise inhumane.

24.     Because of her interest in observing animals, Tracey visited Cricket Hollow Zoo in June 2012.  Among other neglectful conditions, she observed bears kept in a small corncrib cage that was dirty and contained standing water and piled up feces.  Based on what she saw, Tracey was severely distressed by what she had observed, and was haunted by the need to help the animals.

25.     Tracey began spending significant time trying to improve the Cricket Hollow animals' situation.  She submitted several complaints about their welfare to USDA, state agriculture inspectors, and the local sheriff.  And with co-plaintiffs ALDF and her sister, Lisa Kuehl, Tracey filed a number of lawsuits to protect Cricket Hollow animals.  Despite Tracey's efforts and documented conditions at Cricket Hollow, USDA did not confiscate any animals.

26.     In fact, Cricket Hollow added more animals to its facility by exhibiting five bears borrowed from another AWA-licensed exhibitor, Robert Sawmiller.  Tracey continued to visit and was saddened to see more animals suffering from the conditions at Cricket Hollow.

Moreover, she was saddened to see the animals' suffering prolonged due to USDA's arbitrary and capricious failure to intervene and confiscate the animals from the abhorrent conditions.

27.     Because USDA had failed to rescue animals in distress at Cricket Hollow, in 2018, Tracey, her sister Lisa Kuehl, and others, including another ALDF member, sued Cricket Hollow under a public nuisance theory in Iowa court, seeking, *inter alia*, an order requiring Cricket Hollow to send all its animals to approved sanctuaries.  Tracey and Lisa and their co-petitioners prevailed in their Iowa state court action.

28.     The Iowa court ordered that all the exotic animals at Cricket Hollow be removed to sanctuary immediately according to arrangements made by the petitioners and their agents. Expressly identified in the court's removal order were seven brown and black bears.

29.     However, on the first evening of the removal, Tracey learned that the five brown bears were mysteriously no longer at Cricket Hollow and therefore could not be rescued.

30.     Tracey was distraught and upset.  She immediately worried over where the bears went and lamented that she could no longer ensure the bears live out their lives in safe and humane conditions.  Nor could she visit and observe the bears at a sanctuary, as she had planned and expected.

31.     Tracey later discovered that Sawmiller had swooped in before ALDF arrived to carry out the removal and whisked away the five bears with whom she had developed strong emotional and aesthetic connections.

32.     Tracey then learned from a USDA inspection report that of the five adult bears transported from Cricket Hollow to Sawmiller, two died from "transportation stress."  Tracey was distressed that those animals may have been saved had USDA confiscated them at an earlier time, including upon ordering revocation of Cricket Hollow's license.

33.     The three remaining bears continued to suffer under Sawmiller's control at Sawmiller's facilities where USDA inspection reports detail the inhumane treatment of all animals, including the bears.  USDA allowed these animals and others to continue to languish, and only intervened to confiscate certain animals on February 19, 2021, leaving other animals at the inadequate facility.

34.     Tracey was furious about Sawmiller's interference with the relief she received from the Iowa court.  Sawmiller's interference resulting in the death of two of the bears and the continued suffering of the other bears added to her aesthetic and emotional injuries.

35.     Lisa Kuehl ("Lisa") is a member of ALDF.  Like her sister Tracey, from her youngest memories of growing up on an Iowa farm in which she had both farmed animals and pets, she has felt a deep sense of respect, stewardship, and love for animals.

36.     In June 2012, Lisa first visited Cricket Hollow and experienced distress and anguish from the conditions that she observed there.  Because she cared about the animals at Cricket Hollow and was concerned about their health and welfare, she dedicated time to improving their situation.

37.     In addition to her complaints to USDA, state agencies, and the local sheriff about the conditions of the Cricket Hollow animals, Lisa (and many others, including Tracey and ALDF) filed several lawsuits against Cricket Hollow.  Through these lawsuits, Lisa learned that in 2016, Sawmiller lent Cricket Hollow five bears for exhibition and breeding purposes.

38.     As explained above, after Lisa and her co-petitioners won a public nuisance lawsuit in Iowa state court, the judge ordered the removal of all the exotic animals at Cricket Hollow.  But before the petitioners and their agents could carry out the rescue, Sawmiller removed at least five bears and transported them back to its facilities.

39.     Lisa was irritated beyond belief and distraught.  She was immediately concerned about the bears' new confinement and was disheartened to know she could no longer ensure the bears' safety and care as she thought she would.  Adding to her distress, she learned from a USDA inspection report that of the five adult bears Sawmiller removed from Cricket Hollow, two died during transportation, and that the three other bears continued to suffer at Sawmiller's facilities.  Lisa was distressed that those animals may have been saved had USDA confiscated them at an earlier time, including upon ordering revocation of Cricket Hollow's license.  USDA did not confiscate animals from Sawmiller's facility until February 19, 2021.  By that point, the animals were left by the agency to needlessly suffer for years.

40.     The harms suffered by Tracey and Lisa were worsened and prolonged by USDA's failure to confiscate animals despite the agency initiating enforcement and revoking Cricket Hollow Zoo's license.  Likewise, USDA's arbitrary and capricious denial of the petition harms ALDF members like Tracey and Lisa because it perpetuates the agency's inadequate protection of animals and regulatory oversight of AWA-licensed facilities.

41.     These injuries to ALDF and its members are actual and concrete, are presently being suffered, and will be redressed if Plaintiffs prevail in this action.  If Plaintiff prevails, USDA will have to reconsider its denial of the petition for rulemaking and issue a new decision expanding the availability of confiscation under its regulations, consistent with its authority pursuant to the AWA.

**B.  Defendants**

42.     Defendant Thomas J. Vilsack is the Secretary of the United States Department of Agriculture, which includes the Animal and Plant Health Inspection Service ("APHIS").  Congress assigned the Secretary of Agriculture the responsibility of enforcing the AWA.  *See*

7 U.S.C. §§ 2132(b), 2151.  As such, Secretary Vilsack is responsible for review of and decisions

on petitions for rulemaking pursuant to the AWA.  Secretary Vilsack is named a Defendant

solely in his official capacity.

43.      Defendant United States Department of Agriculture is the federal agency tasked

with ensuring the humane treatment of animals under the AWA.  USDA delegated its

responsibilities under the AWA to APHIS.

44.      Defendant Kevin Shea is the Administrator of the Animal and Plant Health

Inspection Service.  APHIS is the agency within USDA responsible for promulgating and

enforcing federal regulations implementing the AWA.  As such, Administrator Shea is

responsible for review of and decisions on petitions for rulemaking pursuant to the AWA.

Administrator Shea is named solely in his official capacity.

45.      Defendant Animal and Plant Health Inspection Service is an agency of USDA and

is responsible for administering the AWA.  Animal Care is the APHIS program tasked with

assuring the humane treatment of AWA-regulated animals.  Animal Care does this primarily by

licensing and inspecting regulated facilities. When Animal Care identifies AWA violations, it

can alert APHIS's Investigative and Enforcement Services program, which may pursue

enforcement actions against violators.

## STATUTORY BACKGROUND

### A.  Animal Welfare Act

46.      Congress passed the AWA to, among other things, "insure that animals intended

for use in research facilities or for exhibition purposes or for use as pets are provided humane

care and treatment . . . ."  7 U.S.C. § 2131(1).

47.     The AWA provides that USDA "shall promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors."  *Id.* § 2143(a)(1).  This includes the establishment of "minimum requirements" for animal handling, care, treatment, and transportation.  *Id.* § 2143(a)(2); *see* 9 C.F.R. pt. 3.

48.     The AWA also empowers the Secretary of Agriculture "to promulgate such rules, regulations, and orders as he may deem necessary in order to effectuate the purposes of this chapter," 7 U.S.C. § 2151—again, to insure the humane treatment of animals used in research facilities and for exhibition purposes.

49.     This broad grant of authority to USDA includes the authority to establish animal confiscation and relocation procedures upon initiation of an enforcement proceeding that could result in license revocation or suspension, or upon the relinquishment, suspension, or termination of a license.

50.     The AWA provides for a license and registration scheme in which animal dealers, exhibitors, handlers, carriers, and researchers must be licensed or registered by USDA and agree to comply with the AWA and its regulations.  *Id.* §§ 2133–34, 2136.

51.     USDA is obligated to inspect and investigate regulated facilities for past and ongoing violations of the AWA.  7 U.S.C. § 2146(a).

52.     The AWA also provides "[t]he Secretary shall promulgate such rules and regulations as he deems necessary to permit inspectors to confiscate or destroy in a humane manner any animal found to be suffering as a result of a failure to comply with any provision of this chapter or any regulation or standard issued thereunder . . . ."  *Id.*

53.     However, the agency's current implementing regulations for the AWA's confiscation mandate only allow for animal confiscation and relocation in very narrow

circumstances.  Specifically, a USDA inspector must find that the animal is suffering as a result

of the failure of the licensee to comply with the AWA and its regulations and standards.

9 C.F.R. § 2.129(a).  Then the inspector must "make a reasonable effort to notify the [licensee]

of the condition of the animal(s) and request that the condition be corrected and that adequate

care be given to alleviate the animal's suffering or distress, or that the animal(s) be destroyed by

euthanasia."  *Id*.  If the licensee refuses, then the inspector "*may* confiscate the animal(s) . . . if,

in the opinion of the Administrator, the circumstances indicate the animal's health is in danger."

*Id*. (emphasis added).  If the licensee cannot be located, the inspector must contact law

enforcement to accompany him to provide temporary care for the animal "when necessary to

alleviate the animal's suffering."  *Id*. § 2.129(b).  The inspector will only then confiscate the

animal "[i]f in the opinion of the Administrator, the condition of the animal(s) cannot be

corrected by this temporary care . . . ."  *Id*.

54.     The regulations provide for confiscation of animals used in AWA-licensed

research facilities under similarly limited circumstances.  9 C.F.R. § 2.38(e).

55.     The regulations are silent on what should happen to animals during or at the

conclusion of enforcement resulting in license revocation or termination.  The regulations also do

not allow parties to intervene during license revocation proceedings to advocate for animal

confiscation and relocation.

56.     While the AWA imposes a mandatory duty on USDA to promulgate regulations

for confiscation when an animal is found to be suffering, 7 U.S.C. § 2146(a), the statutory

scheme's broad grant of authority to USDA to promulgate any regulations necessary to

effectuate the purposes of the AWA provides the requisite authority to confiscate animals in

other circumstances., including upon enforcement and license revocation and termination.  *See* 7
U.S.C. §§ 2143, 2151.

57.     Thus, the agency is required to promulgate regulations for confiscation of animals
who are suffering and may promulgate additional regulations for confiscation of animals for any
other reason needed to effectuate the purposes of the AWA, which includes "insur[ing] that
animals intended for use in research facilities or for exhibition purposes or for use as pets are
provided humane care and treatment . . . ."  7 U.S.C. § 2131(1).

58.     Nothing in the AWA prohibits the agency from promulgating regulations that,
consistent with the purposes of the AWA, allow for confiscation of animals upon initiation of an
enforcement action that may result in license revocation or suspension, or upon relinquishment,
suspension or termination of an AWA license.

**B. Administrative Procedure Act**

59.     The APA provides, "[e]ach agency shall give an interested person the right to
petition for the issuance, amendment, or repeal of a rule."  5 U.S.C. § 553(e).

60.     The APA grants the right of judicial review to "[a] person suffering legal wrong
because of agency action, or adversely affected or aggrieved by agency action . . . ."  *Id*. § 702.

61.     The APA defines "agency action" to "include[] includes the whole or a part of an
agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act,"
*id*. § 551(13), and in turn defines a "rule" as "the whole or a part of an agency statement of
general or particular applicability and future effect designed to implement, interpret, or prescribe
law or policy ," *id*. § 551(4).  *See id*. § 701(b)(2).

62.     Under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." *Id*. § 706(2)(A).

63.     An agency action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983).

64.     In addition, an agency cannot contract the authority that Congress has conferred upon it. *See Union Pac. R.R. Co. v. Brotherhood of Locomotive Eng'rs*, 558 U.S. 67, 86 (2009).

## FACTUAL BACKGROUND

### A.  USDA's Apathetic History of Animal Relocation Under the AWA

65.     When it comes to enforcing the AWA, USDA's modus operandi entails protecting from public scrutiny the entities and individuals it regulates—or in the agency's own words, its "customers"—rather than protecting animals who are at significant risk of exploitation and systemic cruelty in commercial industries.

66.     USDA has been chronically criticized for its lenient interpretation and lax enforcement of the AWA.  The agency's enforcement rates have drastically declined in recent years, as have the rates of its animal confiscation and relocation actions.  The agency's failure to properly implement the AWA to protect animals has resulted in consternation from the taxpaying public, former and current APHIS officials, and Congressmembers.

67.     USDA's Office of Inspector General ("OIG") agrees with these criticisms.  When the OIG audited APHIS's Animal Care Unit in 2010, it found that APHIS was "not aggressively pursuing enforcement actions against violators of the AWA," concluding that "the enforcement process was ineffective against problematic dealers."

68.     But, to this day, the agency still rarely pursues meaningful enforcement against AWA violators.  When an inspector finds an AWA violation, the agency "will typically give the facility a date by which to correct those items"[3] by issuing a notice or warning letter.[4]  Then, if corrective measures are not taken or "the noncompliance presents (or presented) a direct risk to the health and well-being of the animals involved," USDA may proceed by enter a pre-enforcement stipulation with the violator or may institute an administrative proceeding before an Administrative Law Judge.[5]  USDA records show that the agency only pursues enforcement in circumstances involving repeat noncompliance and animal welfare violations over the course of years.  The vast majority of AWA violations, including those involving harms to animal safety and welfare, are merely documented in an inspection report with no action by the agency.  To the extent USDA actually does something more than simply document the noncompliance, the agency mostly proceeds by issuing a warning or monetary fine.  Only on the rarest occasions does the agency pursue suspension or revocation of the violator's license.

---

[3]  APHIS, *Animal Welfare Act Enforcement* (June 2, 2020),
https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/ct_awa_enforcements, also available at https://perma.cc/4SU4-6BJ8 (permanent record created June 7, 2022).
[4]  APHIS, *Animal Welfare Act* (Jan, 12, 2022),
https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/sa_awa, also available at https://perma.cc/NYQ2-SDD9 (permanent record created June 7, 2022).
[5]  *Id*.

69. Even in those rare circumstances where USDA finds violations so repeat and egregious that it pursues license revocation—or even sometimes a lifetime ban on acquiring an AWA license—the agency's practice is to leave at-risk animals with the violator.

70. The 2010 OIG audit report specifically recommended that APHIS "modify regulations to allow immediate confiscation where animals are dying or seriously suffering."  In response, APHIS stated that this recommendation was unnecessary because inspectors could "consider" relocating suffering animals if "there is no evidence relief will be provided [to the animals] in the immediate future."

71. Instead of strengthening USDA's AWA animal relocation procedures, USDA has wound down their use, confiscating and rehoming fewer and fewer animals over the years. According to USDA, it "either confiscated or facilitated the voluntary surrender of over 11,000 animals" between 2010 and 2015.  On information and belief, USDA did not confiscate any animals from 2017 through 2019.  Based on the APHIS's public database of Animal Welfare and Horse Protection Actions, USDA has only confiscated animals in two instances in since the beginning of 2020.[6]

72. These two confiscations themselves illustrate the shortcomings in USDA's current confiscation methods.  On February 19, 2021, seven bears and one cougar were confiscated from Robert Sawmiller dba Wildlife on Wheels.  This was after over a decade of chronic AWA violations, which included failure to provide clean drinking water for animals,

---

[6] *See* APHIS, *Animal Welfare and Horse Protection Actions*, https://www.aphis.usda.gov/aphis/ourfocus/animalwelfare/actions/awa-actions (last visited September 14, 2022), also available at https://perma.cc/G2QT-U8S2 (permanent record created June 7, 2022).  In one other instance that the agency does not consider a "confiscation," an AWA-licensed dog breeder turns over his dogs to the Animal Rescue League of Iowa as part of a consent decree with the agency.  This illustrates that the agency knows confiscation of animals should be an appropriate, statutorily permitted remedy for serious AWA violations.

unclean and unsafe enclosures, and transferring animals to and from unlicensed, unapproved, and unknown facilities.

73.     Many animals died in Sawmiller's care over the years.  This includes one incident in which a cougar was observed by an inspector to be motionless and in apparent distress. Rather than confiscate the animal, the inspector directed Sawmiller to have the animal seek by a veterinarian within 24 hours; but according to a USDA inspection report Sawmiller failed to do so and the cougar was left to succumb from its illness without pain relief or supportive care.

74.     Then, in 2020, despite Sawmiller's chronic failure to comply with the AWA and an inspection from that year documenting 19 non-compliances, USDA absurdly approved Sawmiller's application for renewal of his AWA license.  ALDF brought an APA lawsuit challenging that decision.  *Animal Legal Defense Fund v. Vilsack*, Case No. 1:21-cv-00623 (D.D.C. Mar. 9, 2021).  USDA soon thereafter changed course by initiating an administrative complaint against Sawmiller on July 8, 2021, which resulted in the revocation of his license on April 6, 2022.  Despite all of this, the agency left all but a few animals in Sawmiller's care.

75.     In the other confiscation, just one brown bear was confiscated from a defunct zoo owned by James Svoboda dba Sunrise Side Nature Trail and Exotic Park after an inspector found a wound above the bear's left eye that had been left untreated and worsening for nine months. At the same time, the inspector observed a lion who was "very thin with prominent vertebral bodies" and whose enclosure had not been cleaned for nearly a year, an obese bobcat with matted hair who appeared to be in pain while he walked and whose enclosure had accumulated feces, and bear enclosures in significant disrepair.  The facility's attending veterinarian had retired years earlier and there was no program of veterinary care from a new attending veterinarian.  The facility has a history of AWA violations dating back to 2012, including one

instance where a lion bit off a patron's fingertip.  Regardless, the agency did not seek enforcement and left all animals other than the brown bear with Svoboda.  Ultimately, PETA entered an agreement with Svoboda to never again own exotic or wild animals and to relocate the remaining animals to a sanctuary.[7]

76.     In both circumstances, the facilities' conditions and animal treatment caused such significant suffering that USDA felt compelled to rescue some animals and the facilities' licenses were cancelled.  Yet the agency allowed numerous animals to remain in the very same conditions.

77.     Sawmiller and Svoboda are just two of the many AWA license holders with serious repeat AWA violations in recent years that are continually permitted to house animals that are at great risk for harm.  Yet USDA only half-heartedly pursued confiscation of select animals in these two rare cases.

78.     In one other instance, USDA initially pursued confiscation but then bent to the will of industry.  In 2017, when a facility breeding and raising raccoons for use as pets and in research hit 100 degrees Fahrenheit and the raccoons suffered "severe heat distress," USDA "took a rare step" of confiscating some raccoons and promising to come back for the rest.  But industry lobbying led the Secretary of Agriculture and USDA officials to "block" confiscation of the remaining raccoons and order the return of those the agency seized.[8]

---

[7]  PETA, *Sunrise Side Nature Trail and Exotic Park Factsheet*, https://www.peta.org/wp-content/uploads/2021/08/sunrise-side-nature-animal-educational-park.pdf (last visited July 21, 2022), also available at https://perma.cc/4L88-NY48 (permanent record created June 8, 2022).
[8]  *See* Karin Brulliard & William Wan, *Caged Raccoons Drooled in 100-Degree Heat. But Federal Enforcement Has Faded.*, Washington Post (Aug. 22, 2019), https://www.washingtonpost.com/science/caged-raccoons-drooled-in-100-degree-heat-but-federal-enforcement-has-faded/2019/08/21/9abf80ec-8793-11e9-a491-25df61c78dc4_story.html, also available at https://perma.cc/VJ59-9C2V (permanent record created June 8, 2022).

79.     Even USDA's internal guidance has been modified in recent years to remove animal relocation procedures.  USDA's "Animal Welfare Inspection Guide" is an internal aid for APHIS Animal Care inspectors, providing guidance on how to implement the AWA and its regulations.  In 2013, the Guide had an entire chapter on animal relocation.  Over the years, critical pieces of the chapter disappeared.  The 2020 Guide has no chapter dedicated to animal relocation.

**B.  USDA's Repeat Failures to Remove and Relocate Animals Have Led to Unnecessary Suffering and Death**

80.     The situation at an AWA-regulated roadside zoo in northeastern Iowa underscores the issues inherent in USDA's limited animal removal and relocation regulations and policies.  Cricket Hollow Zoo held an AWA license from 1994 to 2020 and exhibited to the public hundreds of animals—including lions, tigers, bears, baboons, lemurs, macaws, and pigs—in dismal conditions.

81.     Over the years, Cricket Hollow garnered hundreds of documented AWA violations.  The animals at Cricket Hollow suffered from substandard sanitation, housing, pest control, and veterinary care.  Recurrent violations included:  animals eating and defecating in the same area; dead animals left on display for long periods of time; animals suffering psychological damage from a lack of enrichment and improper housing; inadequate shelter from the elements, including extreme cold and heat; and insufficient staffing evidenced by no more than two employees caring for hundreds of animals.

82.     USDA internally acknowledged and documented Cricket Hollow's persistent violations for years.  In 2006, Former APHIS Western Regional Director Robert Gibbens wrote, "it is clear that there is a chronic management problem at the facility, and for whatever reason, the [zoo owners] either do not understand the regulations, are not willing to comply, or are not

21

able to comply." Six years later, in 2012, Gibbens wrote that Cricket Hollow "has been in chronic non-compliance since July 2010." And in 2014, APHIS Administrator Shea wrote that since 2013, the agency found "numerous noncompliances" during its inspections of Cricket Hollow.

83.     ALDF and its members raised concerns to USDA about the animals at Cricket Hollow through letters, phone calls, and emails, but the agency repeatedly rebuffed them and did not confiscate a single animal. USDA's failure to act caused ALDF to pursue other avenues of ensuring the animals at Cricket Hollow received the benefit of AWA protections.

84.     In light of USDA's inaction, ALDF sued Cricket Hollow directly, arguing that its substandard care did not meet the minimum requirements mandated under the AWA and constituted a take under the Endangered Species Act. ALDF prevailed and ultimately removed the endangered animals and relocated them to other facilities. *Kuehl v. Sellner*, 161 F.Supp.3d 678 (N.D. Iowa 2016), *aff'd*, 887 F.3d 845 (8th Cir. 2018).

85.     Concurrently, ALDF sued USDA in 2014 for renewing Cricket Hollow's AWA license while the agency was aware of the facility's chronic AWA violations. In fact, on the same day the agency renewed Cricket Hollow's license, the agency also discovered 11 AWA violations. The D.C. Circuit Court of Appeals held that the USDA's reliance on Cricket Hollow's self-certification of compliance with the AWA was arbitrary and capricious in violation of the APA. *Animal Legal Def. Fund, Inc. v. Perdue*, 872 F.3d 602 (D.C. Cir. 2017).

86.     Only after ALDF sued USDA for rubber-stamping Cricket Hollow's AWA license renewal did the agency act against Cricket Hollow. In 2015, APHIS initiated an enforcement action by issuing an administrative complaint against Cricket Hollow, seeking civil

penalties and license revocation.  Still, the agency did not seek to relocate the animals housed at the woefully deficient facility.

87.     The administrative enforcement proceeding resulted in a November 2017 USDA administrative law judge decision ordering Cricket Hollow cease and desist violating the AWA, pay a $10,000 penalty, and have its AWA license revoked.  The administrative law judge found that Cricket Hollow's "violations are in such frequency and numbers that . . . [r]evocation of the license is necessary."[9]

88.     The proceeding confirmed that Cricket Hollow's AWA violations caused widespread animal suffering.  For instance, a capuchin monkey plucked her hair off and chewed her tail due to stress.  A pig left to give birth in the extreme cold lost three of her piglets.  An emaciated tiger covered in open wounds, cuts, and sores received no medical treatment.  Many animals' food was spoiled, covered in bugs, or contaminated with feces.

89.     Even though USDA proved that Cricket Hollow's AWA violations resulted in pervasive animal suffering, the agency did not remove and relocate the animals.  Revoking Cricket Hollow's AWA license merely prevented Cricket Hollow from exhibiting animals to the public.  This in no way "insured" humane treatment and care of the animals, as the AWA demands.  It resulted in an absurd outcome where USDA recognized Cricket Hollow egregiously failed to meet minimum standards of care, but the agency nonetheless left the animals in the hands of the violators.

---

[9] *In re Cricket Hollow Zoo, Inc.*, Nos. 15-0152–0155 (AWA), 2017 WL 6506038 (U.S.D.A. Nov. 30, 2017).  Cricket Hollow appealed the decision, which an appellate agency adjudicator vacated because the presiding administrative law judge had not been appointed consistent with a subsequently decided Supreme Court decision.  Immediately after the case was remanded to a new administrative law judge, USDA and Cricket Hollow reached a settlement agreement, which included a consent order again revoking Cricket Hollow's AWA license.

90.     Because of USDA's failure to confiscate and relocate the hundreds of animals held without adequate food, water, or veterinary care, the animals continued suffering at Cricket Hollow.  ALDF was thus compelled to file a public nuisance lawsuit on behalf of its members against Cricket Hollow for violations of Iowa animal cruelty laws in Iowa state court, seeking relocation of all the animals.  ALDF filed its public nuisance action in September 2018.

91.     In November 2019, relying on the dozens of AWA violations documented in USDA inspection reports and witness testimony, the Iowa trial court ruled in favor of ALDF and its members, finding Cricket Hollow constituted a public nuisance due to its numerous violations of state animal neglect laws.  The court enjoined the zoo's owners from owning exotic animals and wildlife, and ordered the animals be transferred to reputable sanctuaries.  On appeal, the decision was affirmed.  *Kuehl v. Sellner*, 965 N.W.2d 926 (Iowa Ct. App. 2021).

92.     Starting in December 2019, pursuant to the Iowa state court's order, ALDF removed hundreds of animals from Cricket Hollow and transferred them to sanctuaries across the United States.  But, before ALDF could rescue all the animals from Cricket Hollow, the zoo owners and other wildlife traffickers killed, hid, removed, or sold almost 100 animals.

93.     Many of these animals are still missing and others are known but unreachable. For instance, a kinkajou and cockatiel were sold online.  Some animals, including two brown bears, a coyote, and a fox, died during transport because of a wildlife trafficker's negligence. Other animals survived being trafficked, and ALDF is still searching for them today.

94.     To find the missing animals, ALDF filed a contempt motion against the owners of Cricket Hollow.  Due to the Cricket Hollow owners' deliberate violations of the nuisance abatement order, they were held in contempt of court and ordered to pay $70,000 or serve a six-month sentence in county jail.

95.     Had USDA properly read the AWA to conclude it had the authority to relocate the animals from "chronic" violator Cricket Hollow and exercised that authority when an administrative law judge revoked the zoo's AWA license in 2017, or even before, hundreds of animals would not have continued to suffer—and scores of animals would not have died, been unlawfully trafficked, or otherwise disappeared—before ALDF's rescue began in late 2019. ALDF similarly would not have had to expend tens to hundreds of thousands of dollars on advocating for, and carrying out, the rescue and rehoming of the Cricket Hollow animals.

96.     Lolita the orca is another prime example of the agency's ongoing failure to confiscate an animal in serious need despite the facility no longer having a license to exhibit her. Lolita has been held captive in a small tank at the Miami Seaquarium in Florida since she was brutally taken from her family off the coast of Washington in 1970.  In Lolita's time at the Seaquarium, USDA has concluded that she is kept in conditions that do not meet AWA standards—the agency has nonetheless abandoned her to languish and suffer.

97.     At the Seaquarium, Lolita—who is approximately 20 feet long and weighs 7,500 pounds—is confined to a small, shallow, and barren concrete tank, without adequate protection from the sun, without a single orca companion, and with animals of other species that are not biologically or socially compatible with her.  For more than 50 years, Lolita has been unable to swim any meaningful distance, dive, forage, or carry out virtually any natural behaviors, and she is forced to spend the majority of her life at, or just below, the surface of the water.  The conditions in which she has been and continues to be kept inflict significant physical and mental injuries on her.

98.     In the wild, orcas may swim nearly 100 miles per day, and regularly dive hundreds of feet beneath the ocean's surface.  At the Seaquarium, Lolita is kept in an oblong

tank that measures just 80 feet by 60 feet.  Lolita does not even have free range of this tiny area because the tank has a large concrete obstruction measuring approximately 45 feet long by 5 feet wide in the center that was used as a stage by Lolita's trainers during public performances.  The tank therefore has an unobstructed space of only 80 feet by 35 feet.  Lolita's tank is only 20 feet deep at its deepest point.  Accordingly, the dimensions of the tank and concrete platform prevent Lolita from turning about or swimming freely.

99.     Lolita's tank does not meet the "minimum" size required for orcas under AWA regulations, 9 C.F.R. § 3.104.  This was indeed confirmed by a 2017 USDA OIG audit report related to APHIS's implementation of regulations specific to cetaceans.  The audit concluded that Lolita's tank "would only have an [minimum horizontal dimension] of 35 feet," which "falls short of the minimum requirements for an orca."[10]

100.    Orcas have extremely delicate skin that is susceptible to sunburn and other damage.  But, Lolita's tank offers no natural or artificial shade structures.  Instead, her tank leaves her completely exposed to direct sunlight, including during the most intense heat of the day when no shadows are cast over the tank.  Lolita cannot dive down in her tank to protect herself from the sun because her tank is only 20 feet deep.  Accordingly, it has been reported by a former caretaker that Lolita often suffers sunburns causing her skin to crack and bleed.  She also is at risk for development of cataracts and retinal damage.

101.    USDA indeed found in a 2021 inspection report that the Seaquarium's failure to provide adequate protection from the sun violates the minimum standards required for shelter under AWA regulations, 9 C.F.R. § 3.103(b).

---

[10]  USDA Office of Inspector General, *APHIS: Animal Welfare Act – Marine Mammals (Cetaceans)* (May 2017), https://www.usda.gov/sites/default/files/33601-0001-31.pdf, *also* available at https://perma.cc/THJ9-VBLB (permanent link created July 26, 2022).

102.   The Seaquarium also isolates Lolita from any other member of her species.  For ten years, Lolita lived with another orca named Hugo, who died in 1980 after a brain aneurysm occurred from him repeatedly ramming his head into the side of the tank.  Though orcas are highly social animals with complex family structures and life-long relationships, Lolita has not lived with another orca since Hugo's death.  Rather, she currently shares her tank with Pacific white-sided dolphins, a species with which Lolita is not compatible and would not interact with in the wild.  The dolphins have been known to "rake" her, meaning they scrape her with their teeth.

103.   These conditions violate the minimum standards for social housing required by AWA regulations, 9 C.F.R. § 3.109.

104.   Because USDA has refused to confiscate Lolita despite its own conclusion that her tank—which she has been trapped in for over 50 years—does not meet AWA standards, ALDF and other groups have made numerous attempts to help Lolita through the legal system.

105.   In 2012, when the Seaquarium's AWA license was pending renewal, ALDF and others sent USDA a letter explaining that the conditions in which Lolita is held are inhumane and violate the AWA, and therefore renewal of the Seaquarium's license would be unlawful. Nonetheless, USDA granted the renewal.  ALDF and the other groups then challenged USDA's renewal of the license as arbitrary and capricious in violation of the APA.  USDA argued that license renewal does not require an exhibitor to demonstrate compliance with the AWA—that is only required for initial license issuance.  The court deferred to this interpretation and did not engage with the evidence of the Seaquarium's AWA violations whatsoever.  *See Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206 (11th Cir. 2015).

106.   Then in 2016, after the Seaquarium changed ownership, ALDF and others similarly challenged USDA's decision to add the Seaquarium as an additional site under the new owner's existing AWA license despite the Seaquarium's noncompliance with AWA standards with respect to Lolita.  In 2021, the Eleventh Circuit reversed the district court's dismissal of the case, which is now pending.  *See People for Ethical Treatment of Animals, Inc. v. United States Dep't of Agric.*, 851 F. App'x 896, 897 (11th Cir. 2021); *People for Ethical Treatment of Animals, Inc. v. United States Dep't of Agric.*, 1:16-cv-24793-MGC (S.D. Fl. May, 18, 2016).

107.   Faced with USDA's continual failure to rescue Lolita from her suffering, in 2018 ALDF and others also brought a case against the Seaquarium, arguing that the Seaquarium is perpetrating an unlawful "take" in violation of the Endangered Species Act ("ESA") by harming and harassing Lolita through her inadequate living conditions.  The court held there was no "take" because the ESA regulations "do[] not cover situations in which 'significant' impairment of essential behavioral patterns occurs, but neither injury nor death results."  *See People for the Ethical Treatment of Animals, Inc. v. Miami Seaquarium*, 905 F.3d 1307, 1311 (11th Cir. 2018).

108.   Then, on June 8, 2021, a USDA inspector reported dozens of direct and critical AWA violations related to Lolita and other animals at the Seaquarium.  Among other things, the inspection documents that Lolita's trainer was putting Lolita at a direct health risk by acting directly contrary to the attending veterinarian's recommendations.  Lolita's trainer decreased the amount of feed given to Lolita despite the objection of the facility's attending veterinarian based on seasonal abnormalities in Lolita's health, concerns that she would not be getting enough water (which marine mammals extract from their food), and that lack of food volume would cause Lolita distress.  Also contrary to the veterinarian's instructions, the Seaquarium deliberately fed Lolita and other animals rotting fish.  The trainer also disregarded the veterinarian's instruction

to required Lolita to perform head-in entry jumps, given her advanced age and that Lolita had injured her lower jaw on her enclosure, likely during a performance.  The attending and associate veterinarians also disapproved of a plan to move two Pacific white-sided dolphins into Lolita's pool given her medical and behavioral issues.  Additionally, the inspector documented violations related to the Seaquarium's failure to provide shade for many animals, which resulted in Lolita and five dolphins suffering from eye lesions.  Lolita also had injuries indicate of chlorine burns due to the chlorine setting in her pool being too high.

109.   The June 8, 2021 inspection also documented other AWA violations involving failure to provide adequate medical care and feed to other animals, dangerous disrepair of the facilities (including that which resulted in a dolphin breaking her ribs), children being held over the edge of the orca and dolphin show pool, unsafe chlorine levels and inaccurate chlorine records (including that resulting in a manatee developing severe clinical presentation of nematode larval migrans with a secondary bacterial infection), and numerous instances of dolphins suffering serious injury or even death due from other dolphins.

110.   Despite the serious violations found at this inspection, not a single animal was confiscated.

111.   In 2022, the Seaquarium again changed ownership.  USDA granted the new owners an AWA license that does not include Lolita.  The new owners represent that they do not plan to exhibit Lolita, but nonetheless, she remains indefinitely at the Seaquarium under the same conditions USDA has already found to be inadequate to meet AWA standards.

112.   USDA has essentially abandoned Lolita at this point.  Indeed, Lolita is omitted from USDA's February 22, 2022 inspection report for the Seaquarium despite still being

confined there.  ALDF continues to advocate for Lolita to be rescued and rehomed to a sanctuary

or at minimum a facility with no AWA violations.

113.   Had USDA exerted its statutory authority to confiscate Lolita upon the

termination of the license to exhibit Lolita—especially in light of the scathing 2017 OIG report

and 2021 inspection report—she would not have to continue to suffer.  Moreover, ALDF would

not have to continue to expend significant resources advocating for Lolita's rescue.  These

circumstances illustrate the dire need for the agency to exert the full extent of its statutory

confiscation authority upon license termination.

114.   Yet another illustration of the agency's failure to exert its confiscation authority

and protect animals in need involves Moulton Chinchilla Ranch ("MCR"), a Minnesota

chinchilla breeding facility that supplied chinchillas for use in research.[11] From 2013 to 2018,

USDA inspectors repeatedly documented extensive animal suffering at MCR, including

chinchillas with eyes swollen, weeping, and sealed shut; a thin, unresponsive chinchilla missing

part of her leg who was brutally killed by having her neck broken; and a dead chinchilla left on

top of a cage for so that that her decaying body had to be peeled off of the cage.  During this

time, USDA did not confiscate a single animal from the noncompliant facility.

115.   Despite years of documented AWA violations, USDA waited until November

2018 to pursue administrative enforcement against MCR.  Further delays followed, and it was

not until October 2021 that an Administrative Law Judge ("ALJ") revoked MCR's dealer

license, calling the facility's 213 "willful" violations "absolutely astounding."[12]  The ALJ even

---

[11]  Nancy Blaney, *Why the USDA's failure to enforce the Animal Welfare Act has 'reached a tipping point'*, AlterNet (Aug. 27, 2022), https://www.alternet.org/2022/08/usda-fails-animal-welfare-act/, also available at https://perma.cc/W759-TB4U (permanent link created Sept. 14, 2022).
[12]  *Id.*

expressed regret that the process of enforcement against MCR took so long, stating: "It should not have taken this long for us to get to this point."[13]  Nonetheless, MCR was fined a mere $18,000 and was permitted to keep the nearly 700 chinchillas languishing in its custody.

116.   Then in November 2021, yet another USDA inspection documented multiple failures to comply with AWA standards, including lack of adequate veterinary care and staffing. And again, USDA confiscated none of the animals.

117.   It was not until February 2022 that MCR voluntarily "got[] rid of" all of the chinchillas and was "no longer raising them."[14]  Had USDA confiscated the chinchillas either at the commencement of enforcement proceedings in 2018 or even the license revocation in 2021, the chinchillas would have been relieved of their suffering much earlier and the relocation of the animals could have been overseen by the agency.  This situation illustrates the lengthy timeline on which the agency operates, which prolongs the risk of suffering faced by animals in noncompliant facilities while USDA fails to exert its confiscation authority despite initiating enforcement.

### C.  Plaintiffs' Petition for Rulemaking

118.   On July 19, 2016, ALDF petitioned USDA to establish animal confiscation and relocation procedures under the AWA pending enforcement that could result in license revocation or suspension, or upon the relinquishment, suspension, or termination of a license for any reason.

---

[13]  *Id.*
[14]  PETA, *Breaking: Gone! All Chinchillas out of Moulton Chinchilla Ranch* (Feb. 9, 2022), https://www.peta.org/media/news-releases/breaking-gone-all-chinchillas-out-of-moulton-chinchilla-ranch/, also available at https://perma.cc/ART8-NZP7 (permanent link created Sept. 14, 2022).

119.   The petition documents the issues inherent in abandoning animals in situations so dismal they lead to the agency revoking or terminating an AWA license.  As demonstrated by the Cricket Hollow situation, simply revoking an entity's AWA license does not protect animals.  In fact, revocation often only removes AWA protections—including regular USDA inspections monitoring compliance with the AWA—and potential income to pay for care for animals, such that license revocation without animal relocation causes conditions to worsen.  The combination of the USDA's lackadaisical enforcement of the AWA coupled with its lack of adequate animal relocation procedures leads to increased animal neglect, suffering, and death.

120.   Five-and-a-half years after ALDF filed the petition for rulemaking, USDA still had not issued a decision on it.  Accordingly, on January 20, 2022, ALDF sued USDA for unreasonably delaying response to the petition, in violation of the APA.  *Animal Legal Defense Fund v. Vilsack*, Case No. 1:22-cv-00133 (D.D.C. Jan. 20, 2022).

**D.  USDA's Denial of Plaintiff's Petition for Rulemaking**

121.   After ALDF challenged the agency's unreasonable delay in responding to the rulemaking petition, on March 31, 2022, USDA finally issued its decision denying the petition. Plaintiff's unreasonable delay case was then voluntarily dismissed as moot.

122.   USDA's primary reason for denying the petition was that it does not have the statutory authority to promulgate the proposed amendments; it may only confiscate animals who are directly suffering (as opposed to animals who are at risk for suffering).

123.   USDA also reasoned that "[t]he petition also relies heavily on outdated data and APHIS practices that are no longer utilized since the petition was filed," without explaining how USDA has changed its practices to remedy its prior failures as demonstrated by the historic

examples.  Contrary to the agency's assertions, agency records post-dating the petition show that the problem persists to this day.

124.    USDA also stated that, assuming it has authority to promulgate the requested regulations, it "would not be the best use of APHIS' limited resources" because "[t]he amendments could [] lead to a dramatic expansion in administrative proceedings," and the agency would rather "focus its confiscation efforts on the animals most in need," failing to acknowledge that the animals the petition seeks to help are indeed in dire need.

## CLAIM FOR RELIEF

**Denial of Plaintiff's Petition for Rulemaking in Violation of APA, 5 U.S.C. § 706(2)**

125.    Plaintiff repeats and incorporates herein by reference each of the allegations set forth above.

126.    The purpose of the AWA is "insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment . . . ." 7 U.S.C. § 2131.  Accordingly, Congress instructed USDA to "promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers, research facilities, and exhibitors." *Id*. § 2143(a)(1).  Congress broadly authorized USDA "to promulgate such rules, regulations, and orders as [the agency] may deem necessary in order to effectuate the purposes of [the AWA]." *Id.* § 2151.

127.    This broad mandate and grant of statutory authority includes the power to promulgate regulations for the confiscation upon license revocation, termination, suspension, and relinquishment, and during the enforcement process.  USDA has both a mandatory duty to promulgate regulations for confiscation when an animal is suffering, 7 U.S.C. § 2146(a), as well as additional permissive authority to promulgate confiscation regulations to "insure that animals

33

. . . are provided humane care and treatment," *id*. § 2131.  There is no limit in the AWA on Defendants' authority to promulgate confiscation regulations in circumstances that would effectuate the purposes of the AWA.

128.   Indeed, Defendants' failure to provide for the confiscation of animals in circumstances that USDA knows will cause animal suffering—but where the animals are not immediately suffering in front of a USDA inspector—contravenes the "humane care and treatment" purpose of the AWA.

129.   Accordingly, Defendants' primary reason for the denial of Plaintiff's rulemaking petition—that the agency purportedly does not have the authority to promulgate the proposed regulatory amendments—is both "arbitrary and capricious" and "not in accordance with law" in violation of the APA.  5 U.S.C. § 706(2)(A).

130.   Given that Defendants have the statutory authority to promulgate the requested regulations, USDA's other reasons for the denial are likewise in violation of the APA as "arbitrary, capricious, [and] an abuse of discretion."  *Id*.  As detailed above, Defendants' denial of Plaintiff's rulemaking petition failed to consider important aspects of the problem that were presented in the petition, offered explanations that run directly counter to the evidence before the agency (including its own records), and is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

131.   Defendants' denial of Plaintiff's petition for rulemaking has injured and continues to injure Plaintiff and its members as described herein.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court enter an order:

a) Declaring that Defendants' denial of Plaintiff's petition for rulemaking to be arbitrary, capricious, an abuse of discretion, and/or otherwise not in accordance with law, in violation of the APA, 5 U.S.C. 706(2)(A);

b) Declaring that Defendants have the statutory authority to promulgate regulations providing for confiscation of animals who are at direct risk of suffering;

c) Ordering Defendants to set aside their denial of Plaintiff's rulemaking petition;

d) Ordering Defendants to render a new decision on Plaintiff's petition for rulemaking consistent with the Court's opinion by a Court-ordered deadline;

e) Retaining jurisdiction of this matter until Defendants have fulfilled all statutory and Court-ordered obligations;

f) Awarding Plaintiff its attorneys' fees and all other reasonable costs for this action; and

g) Granting Plaintiff such additional relief as the Court may deem just and proper.

Respectfully submitted this 17th day of October 2022.

_____
Daniel H. Waltz (D.D.C. Bar No. D00424)
ANIMAL LEGAL DEFENSE FUND
The Yard, 700 Pennsylvania Ave., S.E.
Washington, D.C. 20003
(707) 795-2533
dwaltz@aldf.org

Holly Bainbridge (*pro hac vice* forthcoming)
ANIMAL LEGAL DEFENSE FUND
525 E. Cotati Ave.
Cotati, CA 94931
(707) 795-2533
hbainbridge@aldf.org

*Attorneys for Plaintiff*